IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | MISCELLANEOUS NO. H-07-0699 |
| | § | |
| DAVID RUSSELL REYNOLDS, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the court is the application of the United States to medicate involuntarily David Russell Reynolds in an effort to restore his competence to stand trial.  For the reasons explained below the United States' application will be denied.

## I.  Factual and Procedural History

On April 2, 2007, Reynolds was charged by Criminal Complaint with making felonious threats against a federal judge.[1]  He was arrested, detained as a continuing threat, and ordered to have a psychiatric examination to determine his competence to stand trial. On June 1, 2007, the Federal Bureau of Prisons Federal Correctional Institution (F.C.I.) in Fort Worth, Texas, issued medical examination findings indicating that Reynolds was not competent to

--------

[1]See  Criminal  Complaint,  Docket  Entry  No.  1  in  Case No. H-07mj284.

stand trial because he suffered from a delusional disorder, persecutory and grandiose types.[2]  On June 19, 2007, a magistrate judge ruled that Reynolds was not competent to stand trial and granted Reynolds' motion for transfer to a medical referral center.[3]  On July 30, 2007, the magistrate judge ordered that Reynolds be sent to a federal psychiatric facility for further examination, evaluation, and treatment to restore his competence to stand trial.[4]

On November 29, 2007, the Federal Bureau of Prisons' F.C.I. in Butner, North Carolina, issued a report that confirmed Reynolds' continuing incompetence to stand trial and recommended involuntary treatment with antipsychotic medication.[5]  The report acknowledged that on October 19, 2007, a hearing was held at the Butner facility to determine whether Reynolds met the criteria for forced medication to render him nondangerous as articulated by the Supreme Court in Washington v. Harper, 110 S.Ct. 1028 (1990).[6]  Dr. Grant and Dr. Berger opined that "there is a substantial probability that

---

[2]See Psychological Examination, Docket Entry No. 7 in Case No. H-07mj284.

[3]See Minute Entry for Proceedings Held before Judge Calvin Botley, Docket Entry No. 8 in Case No. H-07mj284.

[4]See Order, Docket Entry No. 9 in Case No. H-07mj284.

[5]See November 29, 2007, Forensic Evaluation signed by Drs. Jill R. Grant and Bruce R. Berger.

[6]See id. at 5.

-2-

Mr. Reynolds can be restored to competency by receiving treatment with antipsychotic medication,"[7] "the proposed treatment would be substantially unlikely to have serious side effects which would interfere significantly with [Reynolds'] ability to assist his attorney in preparing and conducting his defense,"[8] and that "treatment with antipsychotic medication is medically and clinically appropriate."[9]   Stating that Reynolds had "adamantly refused medication during this evaluation period," Dr. Grant and Dr. Berger "request[ed] another study period for treatment pursuant to Title 18, United States Code, Section 4241(d) for the purpose of treatment with antipsychotic medications."[10]   They also requested that "involuntary administration of medication be allowed up until the time of [Reynolds'] adjudication and sentencing if treatment is ordered and, in [their] opinion, his competency is restored."[11]

On December 11, 2007, the magistrate judge ordered that an evidentiary hearing be held before a district court judge to determine if Reynolds met the criteria for forced medication intended to render him competent to stand trial articulated by the Supreme Court in <u>Sell v. United States</u>, 123 S.Ct. 2174 (2003)

---

[7]<u>Id.</u> at 9.

[8]<u>Id.</u>

[9]<u>Id.</u> at 9-10.

[10]<u>Id.</u> at 10.

[11]<u>Id.</u>

(Docket Entry No. 1).[12]   The _Sell_ hearing was held on February 13, 2008, and post-hearing briefs have been submitted by both parties (Docket Entry Nos. 7 and 13).   On February 28, 2008, the hearing judge signed an order of recusal (Docket Entry No. 9) and the case was reassigned to the undersigned judge (Docket Entry No. 10).

## II.   **Applicable Law and Standard of Review**

The Due Process Clause of the Fourteenth Amendment provides Reynolds "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs." _Harper_, 110 S.Ct. at 1036. Nevertheless, in _Sell_, 123 S.Ct. at 2184, the Supreme Court held that in rare circumstances a defendant could be involuntarily medicated solely for the purpose of rendering him competent to stand trial for a serious crime, "but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests."   The Supreme Court directed lower courts making such a determination to consider the following four factors:   (1) whether "_important_ governmental interests are at stake," (2) whether "involuntary medication will _significantly further_" those interests, (3) whether "involuntary medication is _necessary_ to further those interests," and (4) whether "administration of the drugs is _medically_

---

[12]See also Docket Entry No. 13 in Case No. H-07mj284.

*appropriate*, i.e., in the patient's best medical interest in light of his medical condition." Id. at 2184-85. The Court observed that "[t]his standard will permit involuntary administration of drugs solely for trial competence purposes in certain instances. But those instances may be rare." Id. at 2184.

The Sell Court did not identify the standard of proof that lower courts are to apply when deciding whether its criteria are satisfied. In United States v. Palmer, 507 F.3d 300, 303 (5th Cir. 2007), the Fifth Circuit adopted the standard of review applied by the Second Circuit in United States v. Gomes, 387 F.3d 157, 160 (2d Cir. 2004), cert. denied, 125 S.Ct. 1095 (2005), according to which the first factor, whether the government's asserted interests are sufficiently important is a legal issue subject to de novo review, while the other Sell factors involve factual findings that are reviewed for clear error. Although the Fifth Circuit did not identify the standard of proof district courts are to use when deciding if the Sell factors have been satisfied, the Second Circuit addressed that issue in Gomes and concluded that the government bears the burden of proving all questions of fact by clear and convincing evidence. 387 F.3d at 160 (citing United States v. Gomes, 289 F.3d 71, 82 (2d Cir. 2002), vacated on other grounds by Gomes v. United States, 123 S.Ct. 2605 (2003)). Given the importance of the constitutional interests at issue, and the Fifth Circuit's decision to follow the Second Circuit's

decision in Gomes, the court concludes that the standard of proof applied by the Second Circuit in Gomes is the appropriate standard to apply in this case and, therefore, that the government bears the burden of proving all questions of fact by clear and convincing evidence.[13]   Clear and convincing evidence is evidence that "place[s] in the ultimate fact finder an abiding conviction that the truth of its factual contentions are 'highly probable.'" Colorado v. New Mexico, 104 S.Ct. 2433, 2437-38 (1984).   At the Sell hearing Reynolds argued without dispute from the United States that the clear and convincing evidence standard applies in this case.[14]

### III.  Analysis

All parties, except Reynolds himself, agree that Reynolds is presently incompetent to stand trial or to assist his attorney in defending him against charges that he threatened a federal judge.[15]

---

[13]A similar conclusion has been reached by the only other circuit court of appeals to have addressed this issue.  See United States v. Bradley, 417 F.3d 1107, 1113-14 (10th Cir. 2005) (questions of fact at Sell hearings "ought to be proved by the government by clear and convincing evidence"), United States v. Valenzuela-Puentes, 479 F.3d 1220, 1224 (10th Cir. 2007) ("Given 'the vital constitutional liberty at stake' . . . district court must find all necessary facts by 'clear and convincing evidence.'").

[14]See Transcript of Hearing Held before Judge Nancy F. Atlas on February 13, 2008, pp. 88-89.

[15]See Defendant's Post-Hearing Memorandum, Docket Entry No. 7, p. 1 n.1, and Government's Post-Hearing Memorandum Regarding Forced Medication, Docket Entry No. 13, p. 4 ¶ 10.

**A.   <u>Sell</u> Hearing**

At the <u>Sell</u> hearing conducted on February 13, 2008, psychiatrists for both the government (Dr. Berger) and the defense (Dr. Scarano) appeared and testified about Reynolds' continuing psychiatric disorders and their preferred treatment options.  The psychologist who examined Reynolds at the Butner facility (Dr. Grant) and Reynolds' brother, Joseph, also testified.

Dr. Grant testified that Reynolds was diagnosed with delusional disorder, both grandiose and persecutory types.[16]  She explained that "persecutory" refers to paranoid ideas about being persecuted, that "grandiose" refers to a sense of self-importance or stature, and that based on collateral information received from Reynolds' brother she believed that Reynolds had been having delusions for at least 25 years.[17]

On direct examination Dr. Berger testified that a study conducted by one of the psychiatrists at the Butner facility showed that seventy-five percent of the people diagnosed with delusional disorder treated with antipsychotic medication improved to the point that they were later considered competent to proceed to trial.[18]  Dr. Berger testified that there are more than ten antipsychotic medications that can be prescribed to treat

---

[16]See Transcript of Hearing Held before Judge Nancy F. Atlas on February 13, 2008, p. 12.

[17]<u>Id.</u> at 13-15.

[18]<u>Id.</u> at 24.

-7-

delusional disorder and that these medications can be subdivided into two classes: first- and second-generation medications.[19] When asked "[w]ith the use of these drugs, do you believe, based on your experience, that you could get Mr. Reynolds back to a state of competence to stand trial?" Dr. Berger answered:

> Statistically, it appears we probably could, given his diagnosis. We don't have past efforts with medication to see whether he has had successful treatment, or whether it would be unsuccessful. We just don't know, but given his diagnosis, it would be more likely than not that the medicine would be helpful to him to the level of regaining competency.[20]

Dr. Berger testified that in his opinion there were no other non-medical treatments available that would achieve substantially the same results as the medical treatments,[21] and that antipsychotic drugs are considered by the psychiatric medical community appropriate drugs for the treatment of delusional disorder.[22] Dr. Berger acknowledged that these drugs can cause serious side effects, but stated that a variety of medications exist that allow these side effects to be treated effectively.[23]

In response to questioning by the court, Dr. Berger testified that if the medication works "very, very well," improvement will be evidenced gradually, first by improved ability to engage in

---

[19]Id. at 27.

[20]Id. at 28.

[21]Id. at 29.

[22]Id. at 30.

[23]Id. at 30-34.

-8-

interactive speech and then by recognition that delusions were once occurring but are no longer occurring.[24]  He testified that if the medication doesn't work well, substantial but not total improvement may be evidenced, but admitted that "at times, people don't respond to the medicine and we can't anticipate which medicine is best for each person."[25]

On cross-examination Dr. Berger testified that his opinion that seventy-five percent of people with Reynolds' diagnosis who are treated with antipsychotic medication improve to the point that they are no longer considered incompetent to stand trial was based on a scholarly project in which one of his colleagues, Dr. Byron Herbel, had reviewed charts and published the results in a peer-reviewed journal.[26]  Dr. Berger also testified that the consensus among psychiatrists and psychologists is that delusional disorders can be treated with medication for the purpose of restoring competency.[27]  When asked which medication(s) he would prescribe for Reynolds, Dr. Berger answered

> I don't approach treatment with involuntary medication
> like picking a specific medication.  My general way of

---

[24]Id. at 37-38.

[25]Id. at 38.

[26]Id. at 39-40.  See Herbel & Stelmach, Involuntary Medication Treatment for Competency Restoration of 22 Defendants with Delusional Disorder, 35 J. Am. Acad. Pscyh. Law 47-59 (2007), appended to Defendant's Post-Hearing Memorandum, Docket Entry No. 7.

[27]Id. at 44.

-9-

working with an involuntary administration of medication, once the order is received . . . I would go to Mr. Reynolds . . . I would go over the different medications available and given the fact that we can give medicine, [I would ask him] does he have any choice of that medicine? . . .

I would then see whether he'd be willing take the medicine orally or if he were — if he would resist to the point that it would have to be given intramuscularly, that would narrow the choice of medications and I would proceed from there.  If, for example, he refused to consider any medicine . . . that would limit it to basically three medicines, Risperidone and then he would take an oral testos, Haldol and the medicine Prolixin.[28]

Upon further examination, however, Dr. Berger acknowledged that if Reynolds refused to take any medication by mouth the treatment options would be limited to the first-generation drugs Haldol and Prolixin because there is no injectable, short-acting form of the second-generation drug Risperidone.[29]  Dr. Berger testified that although dosage amounts for Reynolds had not been considered, there are upper limits, he typically takes a "go slow" approach, and reaction to the medicine could be monitored by the drug's serum blood levels.[30]  Dr. Berger also testified that if Reynolds' condition did not improve with medication, forced medication "would certainly reinforce his delusional belief."[31]

---

[28]Id. at 44-45.

[29]Id. at 45-46.  See also id. at 49 (Risperidone is a second-generation drug while Haldol and Prolixin are first-generation drugs).

[30]Id. at 46.

[31]Id.

On direct examination defendant's psychiatrist, Dr. Scarano, disagreed with Dr. Grant and Dr. Berger's diagnosis of Reynolds as suffering from mixed delusional disorder preferring, instead, a diagnosis of persecutory delusional disorder.[32] Dr. Scarano also disagreed with Dr. Berger's statement that there exists a consensus among medical academics or medical psychiatric practitioners that medication is effective in restoring competency in patients suffering from delusional disorders for the length of time that Reynolds has suffered, i.e., 25 years.[33] Dr. Scarano testified that in his opinion cognitive behavioral therapy could be successful in rendering Reynolds competent to stand trial, but that the initial step required the establishment of a trusting relationship with Reynolds, that if such a relationship could be established medication might be helpful in allaying some of the apprehension, agitation, and anxiety that accompanies delusional disorder, but that absent such a relationship medication would not render Reynolds competent to work with his defense attorney to defend the charge against him.[34] Dr. Scarano also testified that it could take years to get Reynolds to a point where he could work with his attorney.[35] Finally, Dr. Scarano testified that he did not think that medicating Reynolds with first generation drugs would be

---

[32]Id. at 54.

[33]Id. at 57-58, and 95.

[34]Id. at 58-60.

[35]Id. at 60.

medically appropriate because those drugs cause neuromuscular side effects some of which cannot be reversed once they occur.[36]   On cross-examination Dr. Scarano acknowledged that first generation antipsychotic drugs are routinely prescribed irrespective of their potential side effects.[37]

Reynolds' brother, Joseph, testified that Reynolds has suffered from delusions since at least 1982,[38] but that Reynolds has never taken medication for his delusions.[39]   He testified that although eight to ten years ago Reynolds had seen a psychiatrist for a brief period of time, Reynolds stopped seeing the psychiatrist when the psychiatrist diagnosed Reynolds as paranoid delusional.[40]   Reynolds' brother also testified that Reynolds had a history of smoking marijuana.[41]

**B.   <u>Sell</u> Factors**

Reynolds is charged with threatening to assault a federal judge in retaliation for the performance of her official duties.[42] Reynolds does not dispute that the offense with which he is charged

---

[36]<u>Id.</u> at 60-62.

[37]<u>Id.</u> at 71-72.

[38]<u>Id.</u> at 98.

[39]<u>Id.</u> at 100.

[40]<u>Id.</u> at 101.

[41]<u>Id.</u> at 109.

[42]See Criminal Complaint, Docket Entry No. 1, in H-07mj284.

is a serious offense that creates an important governmental interest in timely prosecution.  See United States v. Evans, 404 F.3d 227, 238 (4th Cir. 2005) (threatening a federal judge is a serious offense that places important governmental interests at stake).  Reynolds argues that the government "cannot satisfy the second, third, and fourth prongs of Sell."[43]  Acknowledging that

> two equally qualified psychiatrists have completely differing views on whether the proposed psychiatric drugs would help defendant Reynolds overcome his particular psychiatric disorders and would successfully work to restore defendant's competence,[44]

the United States argues that the opinions and reports of its psychiatrist and psychologist should receive greater weight than those of the defense psychiatrist because they have personally interacted with Reynolds and have successfully used psychiatric drugs on others to overcome the disorders from which he suffers.[45]

1.  Second Sell Factor:  Whether Involuntary Medication Will Significantly Further the State's Interest

The inquiry into whether the administration of involuntary medication will significantly further the government's interests in rendering Mr. Reynolds competent to stand trial requires the court to consider two issues:  (1) whether medication is "substantially

---

[43]Defendant's Post-Hearing Memorandum, Docket Entry No. 7, p. 2.

[44]Government's Post-Hearing Memorandum Regarding Forced Medication, Docket Entry No. 13, p. 6 ¶ 14.

[45]Id. at pp. 6-7 ¶ 15.

likely to render the defendant competent," and (2) whether
medication is "substantially unlikely to have side effects that
will interfere significantly with the defendant's ability to assist
counsel in conducting a trial defense, thereby rendering the trial
unfair."  Sell, 123 S.Ct. at 2184.  The testifying psychiatrists
differed as to whether psychiatric drugs could render Reynolds
competent to stand trial, and the likelihood that those drugs would
cause him to suffer adverse side effects.

      (a)  Substantially Likely to Render Defendant Competent

    Courts read the question of whether proposed medication is
"substantially likely to render the defendant competent" within the
context of the greater question that it is designed to address:
whether the government's interest in a competent defendant will be
significantly furthered through involuntary medication.  This
reading has lead courts to conclude that "substantially likely"
means that there must be a significant likelihood that the proposed
medication will render the defendant competent to stand trial.  See
Gomes, 387 F.3d at 161-62 (seventy-percent chance at restoration to
competence deemed significant); United States v. Ghane, 392 F.3d
317, 320 (8th Cir. 2004) (ten percent chance of restoration,
described as a "glimmer of hope" and deemed not significant);
United States v. Rivera-Morales, 365 F.Supp.2d 1139, 1141 (S.D.

Cal. 2005) ("a chance of success that is simply more than a 50% chance of success does not suffice to meet this standard").

The government's psychiatrist, Dr. Berger, testified at the Sell hearing that a study conducted and published by his colleague, Dr. Herbel, showed that seventy-five percent of the inmates at Butner diagnosed with delusional disorder who were treated with antipsychotic medication achieved competency to stand trial. However, when asked whether he believed that use of antipsychotic medication would render Reynolds competent to stand trial, Dr. Berger opined only that "given his diagnosis, it would be more likely than not that the medicine would be helpful to him to the level of regaining competency."[46] Dr. Berger also acknowledged that if the medication did not improve Reynolds' condition, its forced administration could reinforce his delusional beliefs.[47]

Reynolds argues that the United States has failed to present clear and convincing evidence that forced medication will render him competent to stand trial and that the conclusions reached in the study that Dr. Berger cited in support of his statement -- that seventy-five percent of the inmates at Butner diagnosed with delusional disorder who were treated with antipsychotic medication achieved competency to stand trial -- support the opinion of defense psychiatrist, Dr. Scarano, that the likelihood that

---

[46]See Transcript of Hearing Held before Judge Nancy F. Atlas on February 13, 2008, p. 28.

[47]Id. at 47.

-15-

medication would render Reynolds competent to stand trial is not significant but, instead, "dismal."[48]

The court concludes that the United States has failed to present clear and convincing evidence that the involuntary administration of drugs to Reynolds is "**substantially** likely to render the defendant competent to stand trial." Sell, 123 S.Ct. at 2184. This conclusion is based both on the opinions expressed in the report prepared by Dr. Grant and Dr. Berger on November 29, 2007, and on Dr. Berger's testimony at the February 13, 2008, Sell hearing. In their report, Dr. Grant and Dr. Berger opined that "there is a substantial probability that Mr. Reynolds can be restored to competency by receiving treatment with antipsychotic medication," but their reason for this opinion is that because his "psychotic symptoms are chronic and persistent . . . Reynolds is unlikely to improve in the foreseeable future without treatment with antipsychotic medication."[49] At the Sell hearing Dr. Berger explained that given Reynolds' diagnosis "it would be **more likely than not** that the medicine would be helpful to him to the level of regaining competency."[50] Although the court declines to determine the precise level of success that is significant enough to

---

[48]Defendant's Post-Hearing Memorandum, Docket Entry No. 7, p. 6.

[49]November 29, 2007, Forensic Evaluation signed by Drs. Jill R. Grant and Bruce R. Berger, p. 9.

[50]See Transcript of Hearing Held before Judge Nancy F. Atlas on February 13, 2008, p. 28.

constitute a "substantial likelihood" that a defendant will be rendered competent, a chance of success that is only "more likely than not" does not suffice to meet this standard.  See Gomes, 387 F.3d at 161-62 (seventy-percent chance at restoration deemed sufficient); Ghane, 392 F.3d at 320 (ten percent chance of restoration deemed insufficient); Rivera-Morales, 365 F.Supp.2d at 1141 ("a chance of success that is simply more than a 50% chance of success does not suffice to meet this standard").  Moreover, the findings in the study published by Dr. Herbel and Dr. Stelmach on which Dr. Berger testified that he based his opinion that forced medication was likely to render Reynolds competent to stand trial indicate that the likelihood that medication would render Reynolds competent is not as Dr. Berger testified "more likely than not," but, instead, only a "dismal" one-in-four chance.

The Herbel and Stelmach study was based on review of 22 case files of Butner inmates who were diagnosed with delusional disorder.  The published article divided the 22 cases studied into three groups based on the estimated duration of untreated psychosis (DUP), which was calculated by subtracting the age of onset of psychotic symptoms from the age of admission to the Butner facility.  Based on this definition the authors were able to estimate the DUP for 19 of the 22 patients studied and to find that

> [n]ine individuals had a DUP of five years or less, seven (78%) of whom were restored to competency.  Six defendants had a DUP between 7 and 10 years, all of whom were restored to competency. . . .

In contrast, only one of the four defendants with a much longer DUP (between 13 and 24 years) was viewed as restored to competency, which is similar to the dismal treatment response of 11 percent attaining a "good clinical outcome" in a group of 18 treatment-naive schizophrenic patients who had a DUP greater than 15 years.[51]

Although due to various confounding factors the authors concluded that "DUP is not a useful predictor of nonresponse to antipsychotic medication in delusional patients who have been symptomatic for 10 years or less,"[52] they made no such finding with respect to the usefulness of DUP as a predictor of nonresponse to antipsychotic medication in patients who have been symptomatic for more than ten years.

The findings published in the Herbel and Stelmach article that Dr. Berger cited as the basis for his opinions thus state that after treatment with antipsychotic drugs patients who have suffered from delusional disorders for ten years or less regained competency at the rate of three-in-four but that patients who have suffered from delusional disorders more than ten years regained competency at only the dismal rate of one-in-four.  Since the undisputed testimony of Reynolds' brother was that Reynolds has been suffering from delusions since 1982, i.e., for at least 25 years, the court concludes that the likelihood that forced medication will render Reynolds competent to stand trial is at best a dismal, one-in-four

---

[51]Copy of Herbel & Stelmach article appended to Docket Entry No. 7, p. 9.

[52]Id.

chance.  Accordingly, the court concludes that the United States has failed to satisfy the first prong of the second <u>Sell</u> factor by producing any evidence, much less clear and convincing evidence, that forced medication is substantially likely to render Reynolds competent to stand trial.

> (b)  Substantially Unlikely to Have Side Effects that Will Interfere Significantly with the Defendant's Ability to Assist Counsel in Conducting a Trial Defense, Thereby Rendering the Trial Unfair

In their report Dr. Grant and Dr. Berger asserted that

> [b]ased on what we know about the effects of antipsychotic medications from the treatment literature and from treatment response of patients at FMC Butner, we opine that the proposed treatment would be substantially unlikely to have serious side effects which would interfere significantly with [Reynolds'] ability to assist his attorney in preparing and conducting his defense.[53]

Dr. Berger testified that if Reynolds refused to take anything by mouth the treatment options would be limited to first-generation drugs Haldol and Prolixin because there are no injectable, short-acting forms of second-generation drugs.[54]  Although Dr. Berger testified that first-generation drugs can cause neuromuscular side effects "between 15 and 30 percent of the time,"[55] he also testified

---

[53]November 29, 2007, Forensic Evaluation signed by Drs. Jill R. Grant and Bruce R. Berger, p. 9.

[54]See Transcript of Hearing Held before Judge Nancy F. Atlas on February 13, 2008, pp. 45-46.  <u>See also</u> <u>id.</u> at 49 (Risperidone is a second-generation drug while Haldol and Prolixin are first-generation drugs).

[55]<u>Id.</u> at 32.

that the side effects were not likely to negate the benefit of the medications by making the defendant unable to assist in his own defense.[56]  Dr. Scarano opined that such drugs would not benefit Reynolds, but acknowledged that such drugs are routinely prescribed even though their side effects cannot always be treated.[57] Dr. Scarano explained that such drugs would not benefit Reynolds because the drugs would be forcibly administered in a federal institution that Reynolds has "already incorporated into his delusion of conspirators who are trying to hurt him and torture him."[58]

In light of Dr. Berger's testimony that the first-generation medications with which Reynolds would most likely be medicated cause side effects only 15 to 30 percent of the time, and that any side effects were not likely to negate the benefit that the medications provided by making the defendant unable to assist in his own defense, and Dr. Scarano's failure to present any evidence that the medications' side effects would interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair, the court concludes that clear and convincing evidence establishes that the medication available for treating Reynolds is substantially

---

[56]Id. at 33.

[57]Id. at 71-72.

[58]Id. at 60.

unlikely to cause side effects that would interfere significantly with his ability to assist counsel in conducting a trial defense.

      (c)  Conclusion

For the reasons explained above, the court concludes that the United States has not satisfied the first prong of the second <u>Sell</u> factor by presenting clear and convincing evidence that forced medication is substantially likely to render the defendant competent to stand trial, but has satisfied the second prong of the second <u>Sell</u> factor by presenting clear and convincing evidence that medications available for treating Reynolds are substantially unlikely to interfere significantly with his ability to assist defense counsel in conducting a trial defense, thereby rendering the trial unfair.  The United States' failure to satisfy the first prong of the second <u>Sell</u> factor requires the court to conclude that the government has failed to establish that involuntary medication will significantly further the government's interest in rendering Reynolds competent to stand trial for threatening a federal judge.

    2.  <u>Third Sell Factor:  Whether Antipsychotic Medication is Necessary to Further the Government's Interest</u>

The Supreme Court has instructed lower courts that they must only medicate a defendant involuntarily if "alternative, less intrusive treatments are unlikely to achieve substantially the same result." <u>Sell</u>, 123 S.Ct. at 2185.  Both Dr. Berger and Dr. Scarano testified that alternative, less intrusive treatments such as

cognitive behavioral therapy are available.  However, Dr. Berger testified that absent medication, alternative forms of therapy would not be successful in rendering Reynolds competent to stand trial.[59]  Dr. Berger also testified that if forced medication "didn't help, it would certainly reinforce [Reynolds'] delusional belief."[60]  In contrast, Dr. Scarano testified that given the persistence of Reynolds' delusions, forced medication would not render him competent to stand trial and that alternative treatment, even if successful, would likely take years to render Reynolds competent to stand trial.[61]

The court is not persuaded that the United States has presented clear and convincing evidence that forced medication is necessary to further the government's interest in rendering Reynolds competent to stand trial.  Although Dr. Berger neither quantified the likelihood nor estimated the amount of time that would be needed for medication to render Reynolds competent to stand trial, the Herbel and Stelmach study on which he relied to conclude that medication could render Reynolds competent to stand trial found that people like Reynolds, who have suffered from delusional disorder for well over ten years, regained competency at only a one-in-four rate following treatment with antipsychotic

---

[59]Id. at 28.

[60]Id. at 47.

[61]Id. at 60-65.

medication.[62]  The findings of the Herbel and Stelmach study coupled
with Dr. Berger's testimony that if not successful at improving
Reynolds' condition, forced administration of medication would
reinforce the delusional beliefs that have rendered Reynolds
incompetent to stand trial, compel the court to conclude that the
likelihood that forced medication would improve Reynolds' condition
is outweighed by the likelihood that it would reinforce Reynolds'
delusional beliefs.   Because the reinforcement of Reynolds'
delusional beliefs would not further but, instead, hinder the
government's interest in rendering Reynolds competent to stand
trial, the court concludes that the United States has failed to
present clear and convincing evidence that forced medication is
necessary to further the government's interest in rendering
Reynolds competent to stand trial.

      3.   <u>Fourth Sell Factor:   Whether Administration of
          Antipsychotic Medication Is Medically Appropriate</u>

     The fourth <u>Sell</u> factor requires the court to determine whether
forced medication would be "in the patient's best medical interest
in light of his medical condition."   <u>Sell</u>, 123 S.Ct. at 2185.
Although Dr. Grant and Dr. Berger opined in their November 29,
2007, report that treating Reynolds with antipsychotic medication

---

     [62]Copy of Herbel & Stelmach article appended to Docket Entry
No. 7, p. 9.

would be medically appropriate,[63] the court concludes that the United States has failed to demonstrate by clear and convincing evidence that the involuntary administration of medication to Reynolds would be in Reynolds best medical interest in light of his medical condition.  This conclusion is based both on Dr. Berger's testimony that if the medication did not improve Reynolds' condition, forced administration of it "would certainly reinforce his delusional belief,"[64] on the undisputed testimony that Reynolds has suffered from delusions for over twenty years, and on findings published in the study conducted by Dr. Herbel and Dr. Stelmach that the rate of positive response to medication for individuals like Reynolds whose delusional beliefs had persisted more than ten years was dismally low, i.e., one-in-four.  This evidence compels the court to conclude that the likelihood that forced medication would improve Reynolds' condition is outweighed by the likelihood that it would reinforce his delusional beliefs.  Accordingly, the court concludes that the United States has failed to present clear and convincing evidence that forced medication is in Reynolds' best medical interest in light of his medical condition.

---

[63]See November 29, 2007, Forensic Evaluation signed by Drs. Jill R. Grant and Bruce R. Berger, pp. 9-10.

[64]See Transcript of Hearing Held before Judge Nancy F. Atlas on February 13, 2008, p. 47.

-24-

### IV.  <u>Conclusions and Order</u>

For the reasons explained above, the court concludes that the forced medication of defendant is not constitutionally permissible because the United States has failed to present clear and convincing evidence that the involuntary administration of antipsychotic medication is substantially likely to render the defendant competent to stand trial, is necessary to further the government's interest in prosecuting him for the charge that he threatened a federal judge, or is medically appropriate in light of the defendant's unique circumstances.

Because this Memorandum Opinion and Order may result in the defendant's immediate release, it is **STAYED** for thirty (30) days to allow the United States to initiate a civil commitment proceeding.

**SIGNED** at Houston, Texas, on this 10th day of April, 2008.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE

-25-